```
┌─────────────────────┐
│       FILED         │
│  ┌───────────────┐  │
│  │  FEB 17 2009  │  │
│  └───────────────┘  │
│  CLERK U.S. BANKRUPTCY COURT │
│  CENTRAL DISTRICT OF CALIFORNIA │
│  BY:          Deputy Clerk │
└─────────────────────┘
```

```
┌─────────────────────┐
│      ENTERED        │
│  ┌───────────────┐  │
│  │  FEB 17 2009  │  │
│  └───────────────┘  │
│  CLERK U.S. BANKRUPTCY COURT │
│  CENTRAL DISTRICT OF CALIFORNIA │
│  BY:          Deputy Clerk │
└─────────────────────┘
```

1
2
3
4
5

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### LOS ANGELES DIVISION

| | |
|---|---|
| In re: | Case No.: 06-15173 )<br>Adversary No.: 07-01466 ) |
| Nathan Levi Lewis and Robin Lynn Lewis, | Chapter 7 ) |
| Debtors. | **MEMORANDUM OPINION** ) |
| Edward M. Wolkowitz, Chapter 7 Trustee, | Date:      May 16, 2008 )<br>Time:      9:00 a.m. ) |
| Plaintiff, | Place:     Courtroom 1375 )<br>255 E. Temple Street ) |
| v. | Los Angeles, CA 90012 ) |
| Breath of Life Seventh Day Adventist Church, | ) |
| Defendant. | ) |

The Chapter 7 Trustee initiated an adversary proceeding under 11 U.S.C. § 548(a)(2),[1]

seeking to avoid Debtors' transfers of charitable contributions to the Defendant as constructively

fraudulent transfers. The Court granted judgment for the Defendant.

## I) FACTS

Nathan Levi Lewis ("Dr. Lewis") was a doctor with his own medical practice. On

October 13, 2006 Dr. Lewis and his wife, Robin Lynn Lewis ("Mrs. Lewis"), (together

---

[1] Unless otherwise indicated, all code, chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, in effect on 10/13/06, when the case was commenced.

"Debtors") filed a joint voluntary Chapter 7 petition. The following is a summary of Debtors' assets and liabilities:

- Schedule A. Real Property                                                    $0
- Schedule B. Personal Property                                        $89,168.00
- Schedule C. Property Claimed as Exempt                               $27,500.00
- Amended Schedule D. Creditors Holding Secured Claims               $294,498.28
- Schedule E. Creditors Holding Unsecured Priority Claims            $183,702.66
- Schedule F. Creditors Holding Unsecured Nonpriority Claims          $16,910.00

The Trustee commenced an adversary proceeding against Breath of Life Seventh Day Adventist Church ("Defendant" or "Church"), seeking to avoid contributions Dr. Lewis made to the Church in 2005 and 2006 as constructively fraudulent transfers ("Transfers").[2] The causes of action were under §§ 544(b), 548(a), and 550(a). Dr. Lewis made contributions to the Church as follows:

| Post Date | Amount of Payment |
|---|---|
| 1/10/2004 | $1,000 |
| 2/14/2004 | $900 |
| 7/17/2004 | $1,300 |
| 10/2/2004 | $2,000 |
| 11/27/2004 | $1,500 |
| **Total for 2004** | **$6,700** |
| 2/19/2005 | $1,800 |
| 3/26/2005 | $2,500 |
| 4/2/2005 | $2,500 |
| 6/18/2005 | $1,500 |
| 7/16/2005 | $1,630 |
| 7/23/2005 | $1,550 |
| 10/8/2005 | $500 |
| 10/15/2005 | $1,500 |
| 12/17/2005 | $4,000 |
| 12/31/2005 | $900 |
| **Total for 2005** | **$18,380** |
| 1/21/2006 | $1,540 |
| 3/11/2006 | $2,000 |

---

[2] Because neither party produced evidence that Debtors made charitable contributions to any other qualified religious or charitable entity, the Court will base its § 548(a)(2) analysis only on the transfers made to the Defendant.

|  |  |
|---|---|
| 4/15/2006 | $2,000 |
| 5/13/2006 | $350 |
| 5/27/2006 | $1,500 |
| 6/24/2006 | $1,600 |
| 7/15/2006 | $2,450 |
| 8/19/2006 | $1,000 |
| 9/30/2006 | $1,550 |
| **Total for 2006 up to petition date** | **$13,990** |
| 11/18/2006 | $1,000 |
| 12/16/2006 | $2,800 |
| 12/30/2006 | $1,000 |
| **Total for 2006** | **$18,790** |

At trial the Trustee asserted that Debtors' gross annual income ("GAI") was the gross receipts from Dr. Lewis' business minus the cost of goods and operating expenses. The Trustee pointed to Debtors' 2005 tax return to argue that Debtors' GAI was $95,645 at the time the 2005 Transfers were made. Defendant countered that Debtors' 2005 GAI was $291,397: the gross receipts of Dr. Lewis' medical practice of $325,920 reduced only by cost of goods sold.

## II) DISCUSSION

### A) Constructive Fraud

The Religious Liberty and Charitable Donation Protection Act of 1998 ("RLCDPA") amended several provisions of the Bankruptcy Code, including §§ 544(b), 548(a)(2), 707(b), and 1325(b)(2)(A).[3] The RLCDPA modified the Bankruptcy Code to protect certain contributions to qualified religious or charitable organizations by debtors under both Chapter 7 and Chapter 13. Subparagraph (A) of § 548(a)(2) prevents the trustee from avoiding as constructively fraudulent a charitable contribution to a qualified religious or charitable organization if the amount of the contribution was not more than 15% of the debtor's GAI. Subparagraph (B) prevents the trustee from avoiding a charitable contribution to a qualified organization that exceeded 15% of the

---

[3] *See* Religious Liberty and Charitable Donation Protection Act of 1998, Pub. L. No. 105-183, 112 Stat. 518 (1998).

debtor's GAI, if the contribution was consistent with the debtor's practices of making charitable contributions.

Although the amended complaint listed the contributions made in 2006, the Trustee's trial brief indicated that he was no longer pursuing these transfers, as the brief requested recovery of only $19,380[4] plus interest, instead of the original $32,370 as stated in the amended complaint. In addition, although the amended complaint included causes of action under §§ 544 and 548, the Trustee's trial brief stated that he was claiming under § 548; there were no arguments made by the Trustee under § 544.

The Trustee had the burden of proving there was a constructively fraudulent transfer under § 548.[5] To avoid a transfer as constructively fraudulent, the Trustee must have shown that Debtors received less than a reasonably equivalent value in exchange for such transfer and were either (1) insolvent on the date of such transfer or became insolvent as a result of the transfer, (2) engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with Debtors was an unreasonably small capital, or (3) Debtors

---

[4] The actual amount of donations given to the Church in 2005 was $18,380.

[5] See, e.g., U.S. v. Crystal Evangelical Free Church (In re Young), 82 F.3d 1407, 1414 (8th Cir. 1996) ("In order to find a fraudulent transfer, or, more accurately, an avoidable transfer, has occurred under 11 U.S.C. § 548(a)(2), the trustee must prove by a preponderance of the evidence that (1) there was a transfer of an interest of the debtor in property, (2) the transfer was made within one year before the date of the filing of the petition, (3) the debtor was insolvent on the date the transfer was made, and (4) the debtor received less than a reasonable equivalent value in exchange for the transfer.") (citation omitted); Cooper v. Ashley Commc'ns, Inc. (In re Morris Commc'ns NC, Inc.), 914 F.2d 458, 466 (4th Cir. 1990) ("Section 548(a)(2)(A) and (B), which is the statute on which the Trustee bases his action, enables the bankruptcy Trustee to avoid any transfer of property by the bankrupt within one year of the filing of the bankruptcy petition if the debtor received less than a 'measurably equivalent value' and was insolvent on the date of such transfer or became insolvent as a result of such transfer. The burden of establishing these conditions rests on the trustee.") (citations omitted); Brandt v. nVidia Corp. (In re 3DFX Interactive, Inc.), 389 B.R. 842, 863 (Bankr. N.D. Cal. 2008) ("Under 'Bankruptcy Code § 548, the Trustee has the burden of proving the elements of a fraudulent transfer by a preponderance of the evidence.") (citing Whitehouse v. Six Corp., 40 Cal. App. 4th 527, 534 (1995)) (other citation omitted); Hawkins v. Garcia (In re Sneed), No. 07-1094, 2008 WL 1782375, at *4 (Bankr. E.D. Cal. Apr. 18, 2008) ("[T]he Trustee bears the burden to prove each element of his claim for relief; the Trustee must show that the Debtor did not receive 'reasonably equivalent value.'") (citing 5 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 548.10 (15th ed. rev. 2007)) (other citation omitted); 5 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 548.10 (15th ed. rev. 2008).

1    intended to incur, or believed they would incur, debts that would be beyond their ability to pay as

2    such debts matured.

3    **1) Reasonably equivalent value was not exchanged**

4    The Transfers were contributions to the Defendant, a church, as tithes and offerings.

5    

6    Some courts have found that there is no reasonably equivalent value in exchange when donating

7    to a church.[6]

8    In the instant case, Defendant argued that Debtors believed "10% of their gross income

9    belongs to God and another 5% should be given as an offering to the church."[7]  In addition, Dr.

10   Lewis stated in his deposition that "the tithe belongs to God. It is not mine."[8]  Defendant did not

11   

12   argue that Debtors received anything in exchange for the Transfers.  Thus, this Court determines

13   

14   _____

15   [6] Prior to the enactment of the RLCDPA, some courts found that there was no reasonably equivalent value in exchange when donating to a church.  *See In re Young*, 82 F.3d at 1414-15; *Weinman v. Word of Life Christian Ctr. (In re Bloch)*, 207 B.R. 944, 948 (D. Colo. 1997); *Morris v. Midway S. Baptist Church (In re Newman)*, 203 B.R. 468, 473-74 (D. Kan. 1996).  Other courts have found that there was reasonably equivalent value in exchange when donating to a church. *Ellenberg v. Chapel Hill Harvester Church, Inc. (In re Moses)*, 59 B.R. 815, 819 (Bankr. N.D. Ga. 1986); *Wilson v. Upreach Ministries (In re Missionary Baptist Found., Inc.)*, 24 B.R. 973, 979 (Bankr. N.D. Tex. 1982). Post-RLCDPA, some courts have found that there was no reasonably equivalent value in exchange when donating to a church. *Geltzer v. Universal Church*, Nos. CV-04-2061, CV-04-2062, 2005 WL 6124844, at *2 (E.D.N.Y. Feb. 22, 2005) (mem. and order) ("The Debtor's donations were not for 'fair consideration' because, by definition, they were not 'in exchange' for any service provided by the charity nor were given 'to secure a present advance or antecedent debt.'  The undisputed evidence reveals that membership in the Church was not contingent on tithing.") (citations omitted); *Liebersohn v. First Baptist Church of Collingdale (In re C.F. Foods, Inc.)*, No. CIV.A. 01-2849, 2001 WL 1632272, at *1 (E.D. Penn. Dec. 20, 2001) (mem.) (concluding that there was no reasonably equivalent value in exchange for the transfer where the defendants admitted in their answer that they received the payments for less than reasonably equivalent value.); *Liebersohn v. Campus Crusade for Christ, Inc. (In re C.F. Foods, L.P.)*, 280 B.R. 103, 111 (Bankr. E.D. Penn. 2002) (finding that there was no reasonably equivalent value in exchange for the transfer "because, in its answer to the trustee's interrogatories, Campus Crusade admitted that the Transfers were not in return for 'the delivery of goods, services or loans of money or other reasonably equivalent value delivered by [Campus Crusade] to the Debtor.'"); *Jacobson v. Church of Manalapan, Inc. (In re Jackson)*, 249 B.R. 373, 376 (Bankr. D.N.J. 2000) (determining that there was no reasonably equivalent value in exchange for the transfer where it was conceded that the debtor received no 'value' as defined by Code section 548(d)(2)(A) in exchange for the transfer.).  One court post-RLCDPA has found there was reasonably equivalent value in exchange when donating to a church. *Hovis v. Ducate (In re Ducate)*, 369 B.R. 251, 265-66 (Bankr. D.S.C. 2007) (finding that a debtor received reasonably equivalent value in exchange for transfers made into a household account, which account was used to pay expenses, including charitable contributions to a church, where the defendant produced evidence of the transfers and where the plaintiff did not refute the evidence.).

16   [7] (Def.'s Br. 1).

17   [8] (Nathan Lewis Dep. 39:20-21, Oct. 5, 2007).

18   

19   

20   

21   

22   

23   

24   

25   

26   

27   

28

that there was no reasonably equivalent value in exchange for the Transfers.

### 2) Debtors insolvent – balance sheet test

Under the balance sheet test[9] the Trustee also must have shown that Debtors were "insolvent on the date that such transfer was made . . . or became insolvent as a result of such transfer . . . . "[10]  Section 101(32) defines "insolvent" to generally mean the

> [F]inancial condition such that the sum of [an] entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of - (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and (ii) property that may be exempted from property of the estate under section 522 of this title . . . .

In this case, because the amount of debt of $495,110.96[11] was greater than their nonexempt assets of $61,668.00,[12] it appears Debtors were insolvent at the time of the Transfers. In his deposition Dr. Lewis stated that the personal property listed on Schedule B "represent pretty much the same personal property that [Debtors] have held over the last several years,"[13] other than the exchange of one vehicle for another leased vehicle.[14]  In addition, there was no evidence that Debtors owned any real property when the transfers occurred.  Thus, this Court finds that Debtors were insolvent at the time the Transfers were made.

This Court concludes that the Trustee met his burden of proving constructive fraud.  The burden then shifted to Defendant to show that the safe harbor provisions of § 548(a)(2) apply.

---

[9] *Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.)*, 96 B.R. 275, 277 (B.A.P. 9th Cir. 1989) ("[U]nder this 'balance sheet' test a debtor is insolvent when its liabilities exceed its assets.").
[10] 11 U.S.C. § 548(a)(1)(B)(ii)(I) (2006).
[11] Schedule D $294,498.28 + Schedule E $183,702.66 + Schedule F $16,910.00 = $495,110.94.
[12] Schedule A $0.00 + Schedule B $89,168.00 – Schedule C $27,500.00 = $61,668.00.
[13] (Nathan Lewis Dep. 71:11-14, Oct. 5, 2007).
[14] (Nathan Lewis Dep. 69:1-71:19, Oct. 5, 2007).

1  **B) Safe Harbor – 11 U.S.C. § 548(a)(2)**

2  11 U.S.C. § 548(a)(2) provides that

3  A transfer of a charitable contribution to a qualified
4  religious or charitable entity or organization shall not be
   considered to be a transfer covered under paragraph (1)(B)
5  in any case in which—(A) the amount of that contribution
   does not exceed 15 percent of the gross annual income of
6  the debtor for the year in which the transfer of the
   contribution is made; or (B) the contribution made by a
7  debtor exceeded the percentage amount of gross annual
8  income specified in subparagraph (A), if the transfer was
   consistent with the practices of the debtor in making
9  charitable contributions.

10 There is no dispute that the Transfers were "charitable contribution[s]" or that the Church was a

11

12 "qualified religious or charitable entity or organization."

13    The issues are whether the Transfers exceeded Debtors' GAI, and if they did, whether the

14 Transfers were consistent with Debtors' practice of giving charitable contributions. The Trustee

15 argued that Debtors' contributions for 2005 were 20% of Dr. Lewis' business income for that

16 same year, exceeding the 15% limitation. He further argued that donations for 2004 and 2006

17

18 consisted of 12% of Debtors' GAI for each year, so the donations in 2005 were not consistent

19 with Debtors' practice of contributing 12% in 2004 and 2006. The Trustee conceded that since

20 the transfers in 2006 were 12% of Debtors' GAI, these transfers were protected under §

21

22 548(a)(2)(A) because they did not exceed 15% of Debtors' GAI. The Church argued that the

23 amount of Debtors' contributions fell below 15% of their GAI, and even if Debtors'

24 contributions exceeded 15% of their GAI, the contributions were consistent with Debtors'

25 practices of making charitable contributions.

26 **1) Gross annual income**

27 The Court's task is to determine Debtors' GAI. The Bankruptcy Code does not define

28

the term "gross annual income," and there is no reported case defining "gross annual income"

within the meaning of § 548(a)(2).

### (a) Plain meaning of the term "gross annual income"

The plain language of a statute is the starting point for its interpretation.[15] "If the intent

of Congress is clear, that is the end of the matter; for the court . . . must give effect to the

unambiguously expressed intent of Congress."[16] "A fundamental canon of statutory construction

is that, unless otherwise defined, words will be interpreted as taking their ordinary,

contemporary, common meaning."[17]

Webster's Third New International Dictionary of the English Language Unabridged

defines "gross" as "to make, earn, or bring in (an overall total) exclusive of deductions (as taxes,

expenses) . . .";[18] "annual" as "occurring, appearing, made, done, or acted upon every year or

once a year . . .";[19] and "income" as "a gain or recurrent benefit that is [usually] measured in

money and for a given period of time, derives from capital, labor, or a combination of both . . .

."[20] As a result, the plain meaning of "gross annual income" for a business would be money

received on a yearly basis, without deducting any costs for the operation of the business.

---

[15] *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982) ("As in all cases involving statutory construction, 'our starting point must be the language employed by Congress,' and we assume 'that the legislative purpose is expressed by the ordinary meaning of the words used.' Thus '[absent] a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.'") (citations omitted); *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980) ("We begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive."); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337 (1979) ("As is true in every case involving the construction of a statute, our starting point must be the language employed by Congress."); *Malat v. Riddell*, 383 U.S. 569, 571-72 (1966) ("As we have often said, 'the words of statutes -- including revenue acts -- should be interpreted where possible in their ordinary, everyday senses.' Departure from a literal reading of statutory language may, on occasion, be indicated by relevant internal evidence of the statute itself and necessary in order to effect the legislative purpose.") (citations omitted); *Richards v. U.S.*, 369 U.S. 1, 9 (1962) ("[T]he legislative purpose is expressed by the ordinary meaning of the words used.").
[16] *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) (citation omitted).
[17] *Perrin v. U.S.*, 444 U.S. 37, 42 (1979) (citation omitted).
[18] *Webster's Third New International Dictionary of the English Language Unabridged* 1002 (1986).
[19] *Webster's Third New International Dictionary of the English Language Unabridged* 88 (1986).
[20] *Webster's Third New International Dictionary of the English Language Unabridged* 1143 (1986).

**(b) Other places in the Bankruptcy Code where "income" is used are helpful in defining "gross annual income" in § 548(a)(2)**

In addition to looking at the plain meaning of GAI, this Court may look to other sections of the Bankruptcy Code where the word "income" is used, as their definitions or interpretations may be helpful in defining GAI in § 548(a)(2).   The Supreme Court of the United States has observed that

> The correct rule of interpretation is, that if diverse statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them . . . . If a thing contained in a subsequent statute, be within the reason of a former statute, it shall be taken to be within the meaning of that statute . . . ; and if it can be gathered from a subsequent statute *in pari materia*, what meaning the legislature attached to the words of a former statute, they will amount to a legislative declaration of its meaning, and will govern the construction of the first statute.[21]

Section 101(10A) states

> The term "current monthly income" - (A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on - (i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or (ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and (B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the

---

[21] *Branch v. Smith*, 538 U.S. 254, 281 (2003) (quoting *U.S. v. Freeman*, 44 U.S. 556, 564-65 (1845)).  *See also Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 596 (2004) ("Statutory language must be read in context [since] a phrase 'gathers meaning from the words around it.'") (quoting *Jones v. U. S.*, 527 U.S. 373, 389 (1999)); *Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 801-02 (D.C. Cir. 2002) ("Statutory provisions *in pari materia* normally are construed together to discern their meaning") (citations omitted).

debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent), but excludes benefits received under the Social Security Act, payments to victims of war crimes or crimes against humanity on account of their status as victims of such crimes, and payments to victims of international terrorism (as defined in section 2331 of title 18) or domestic terrorism (as defined in section 2331 of title 18) on account of their status as victims of such terrorism.

The bankruptcy court for the District of Montana has noted that "income" is not defined in the Code and that both § 101(10A) and the Internal Revenue Code distinguish between "income from all sources" and "taxable income," so the Internal Revenue Code provides guidance in defining "income."[22]

In *Blausey v. United States Trustee*, the United States Court of Appeals for the Ninth Circuit stated that

> The phrase "without regard to whether such income is taxable income" in 11 U.S.C. § 101(10A)(A) reflects Congress' judgment that the Internal Revenue Code's method of determining taxable income does not apply to the Bankruptcy Code's calculation of [current monthly income].[23]

Similarly, in *Drummond v. Wiegand (In re Wiegand)*[24] the Ninth Circuit Bankruptcy Appellate Panel ("BAP") held

---

[22]*In re Featherston*, Nos. 07-60296-13 and 07-60441-13, 2007 WL 2898705, at *11 (Bankr. D. Mont. Sept. 28, 2007) ("Paragraph A of § 101(10A) [sic] sets out its general rule that all 'income' received by the debtor(s) should be included in calculating current monthly income. There is no definition of 'income' in the Bankruptcy Code. However, because § 101(10A)(A) [sic] distinguishes between 'income from all sources' and 'taxable income,' it appears to reflect the distinction in the Internal Revenue Code between 'gross income,' and 'taxable income.' Accordingly, the Internal Revenue Code should provide general guidance for determining 'income' used in § 101(10A)(A) [sic]. That guidance includes a long list of items that constitute 'income,' such as compensation for services, business earnings, gains on dealing in property, interest, rents, royalties, dividends, alimony and maintenance, pensions, prizes and awards, and unemployment compensation.") (citing Eugene R. Wedoff, *Means Testing in the New § 707(b)*, 79 Am. Bankr. L. J. 231, 244-45 (2005)) (bracketed material in original).
[23] No. 07-15955, 2009 WL 153241, at *7 (9th Cir. Jan. 23, 2009).
[24] 386 B.R. 238 (B.A.P. 9th Cir. 2008).

a chapter 13 debtor engaged in business may not deduct ordinary and necessary business expenses from gross receipts for the purpose of calculating current monthly income as defined under § 101(10A). Rather, such deductions are authorized under § 1325(b)(2)(B) and, therefore, are to be subtracted from current monthly income when calculating disposable income pursuant to § 1325(b)(2).[25]

The Ninth Circuit Court of Appeals and the Ninth Circuit BAP pointed out that because § 101(10A) contains the phrase "without regard to whether such income is taxable income," Congress intended that Internal Revenue Code concepts not apply when determining a debtor's current monthly income. Since § 548 does not contain similar exclusionary language, this Court is not restricted from using the Internal Revenue Code in defining "gross annual income" for purposes of § 548(a)(2).

Section 101(51B)[26] uses the term "gross income" in the definition of "single asset real estate." In *In re Club Golf Partners, L.P.*[27] the bankruptcy court for the Eastern District of Texas adopted the Internal Revenue Code term "gross income" in defining gross income under § 101(51B) and stated that "Congress used the Revenue Code term 'gross income' in this portion of the definition. Thus, it is irrelevant whether, prior to the Petition Date, the Debtor has had net income or losses; the focus is on all revenues received . . . ."[28]

---

[25] *Drummond v. Wiegand (In re Wiegand)*, 386 B.R. 238, 239 (B.A.P. 9th Cir. 2008) (citation omitted).
[26] Section 101(51B) provides

> The term "single asset real estate" means real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the *gross income* of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental. 11 U.S.C. § 101(51B) (2006) (emphasis added).

[27] No. 07-40096-BTR-11, 2007 WL 1176010 (Bankr. E.D. Tex. Feb. 15, 2007).
[28] *In re Club Golf Partners, L.P.*, No. 07-40096-BTR-11, 2007 WL 1176010, at *5 (Bankr. E.D. Tex. Feb. 15, 2007).

1        The term "gross income" also appears in §§ 101(18),[29] (19A),[30] and (20)[31] in the

2    definitions of "family farmer," "family fisherman," and "farmer," respectively.  The Seventh

3    Circuit Court of Appeals held that in defining the term "farmer," "gross income" should be

4    equated to gross income in the Internal Revenue Code. [32]

5        This Court finds the reasoning of the opinions using the Internal Revenue Code to define

6

7    [29] Section 101(18) provides in pertinent part

8            The term "family farmer" means - (A) individual or individual and
         spouse engaged in a farming operation whose aggregate debts do not

9            exceed $3,237,000 and not less than 50 percent of whose aggregate
         noncontingent, liquidated debts (excluding a debt for the principal

10           residence of such individual or such individual and spouse unless such
         debt arises out of a farming operation), on the date the case is filed,

11           arise out of a farming operation owned or operated by such individual
         or such individual and spouse, and such individual or such individual

12           and spouse receive from such farming operation more than 50 percent
         of such individual's or such individual and spouse's gross income

13           for— (i) the taxable year preceding; or (ii) each of the 2d and 3d
         taxable years preceding; . . . 11 U.S.C. § 101(18) (2006) (emphasis

14           added).
     [30] Section 101(19A) provides in pertinent part

15           The term "family fisherman" means — (A) an individual or individual
         and spouse engaged in a commercial fishing operation— (i) whose

16           aggregate debts do not exceed $1,500,000 and not less than 80 percent
         of whose aggregate noncontingent, liquidated debts (excluding a debt

17           for the principal residence of such individual or such individual and
         spouse, unless such debt arises out of a commercial fishing operation),

18           on the date the case is filed, arise out of a commercial fishing operation
         owned or operated by such individual or such individual and spouse;

19           and (ii) who receive from such commercial fishing operation more than
         50 percent of such individual's or such individual's and spouse's gross

20           income for the taxable year preceding the taxable year in which the
         case concerning such individual or such individual and spouse was

21           filed; . . . 11 U.S.C. § 101(19A) (2006) (emphasis added).
     [31] Section 101(20) provides in pertinent part

22           The term "farmer" means (except when such term appears in the term
         "family farmer") person that received more than 80 percent of such

23           person's gross income during the taxable year of such person
         immediately preceding the taxable year of such person during which

24           the case under this title concerning such person was commenced from a
         farming operation owned or operated by such person.  11 U.S.C. §

25           101(20) (2006) (emphasis added).
     [32] See In re Wagner, 808 F.2d 542, 549 (7th Cir. 1986) ("The way to make section 101(17) work best is to make it

26   work simply.  That is most easily done by deeming the statute to incorporate the definition of gross income in
     federal income tax law.  Then everyone will know where he stands.  Given the arbitrary nature of the statutory

27   definition of farmer, no higher value than certainty can be served by the interpretation of the words gross income;
     and the interpretation that best serves that value is the one that equates gross income in the Bankruptcy Code to

28   gross income in the tax code.").

1  "gross income" persuasive for the present case.  Using the canon that similar terms should be

2  defined similarly in the same statute[33] (here, the Bankruptcy Code) and looking to the cases that

3  have used the Internal Revenue Code to define "gross income" in other places in the Bankruptcy

4

5  Code, this Court determines "gross income" as defined in the Internal Revenue Code should

6  likewise be used to define "gross annual income" in § 548(a)(2), since the only difference

7  between the terms is the temporal modifier, "annual."

8         The Internal Revenue Code in 26 U.S.C. § 61 defines "gross income" generally as

9

10            [A]ll income from whatever source derived, including (but
          not limited to) the following items:

11            (1)  Compensation  for  services,  including  fees,
          commissions, fringe benefits, and similar items;

12            (2) Gross income derived from business;
          (3) Gains derived from dealings in property;

13            (4) Interest;
          (5) Rents;

14            (6) Royalties;

15            (7) Dividends;
          (8) Alimony and separate maintenance payments;

16            (9) Annuities;

17            (10) Income from life insurance and endowment contracts;
          (11) Pensions;

18            (12) Income from discharge of indebtedness;
          (13) Distributive share of partnership gross income;

19            (14) Income in respect of a decedent; and

20            (15) Income from an interest in an estate or trust.

21  As a result, "gross income," and likewise "gross annual income," should <u>not</u> be defined as

22  subtracting any costs or expenses.  "Where statutory language is plain, 'the sole function of the

23  courts - at least where the disposition required by the text is not absurd - is to enforce it

24

25

26

27  [33] *See Woodford v. Ngo*, 548 U.S. 81, 107 (2006) ("Consistent with this presumption, if we have already provided a definitive interpretation of the language in one statute, and Congress then uses nearly identical language in another statute, we will give the language in the latter statute an identical interpretation unless there is a clear indication in

28  the text or legislative history that we should not do so.") (citation omitted).

according to its terms.'"[34]  It is not absurd to choose the tax definition of gross income because, among other things, this definition would permit higher earners to give more money to charitable organizations.

### (c) Other places in the Bankruptcy Code where "income" is used are helpful to show how "gross annual income" of § 548(a)(2) should <u>not</u> be defined

Just as looking to other sections of the Bankruptcy Code aids this Court in determining the definition of GAI, there are other places in the Bankruptcy Code that show how GAI in § 548(a)(2) should <u>not</u> be defined.  For example, the term "disposable income" under Chapters 12 and 13[35] is defined so as to <u>deduct</u> the expenses of operating a business.  Consequently, if Congress intended to have "gross income" reflect a deduction for operating expenses, it could have used "disposable income" instead in § 548.  "When Congress includes language in one part of a statute and excludes it from another part of the same statute, it is presumed the Congress acted purposely in the disparate inclusion or exclusion."[36]  This Court will not use the definitions of "disposable income" because this term is defined in the Code, and if Congress desired to use this definition in § 548(a)(2), it could have utilized this term.  Instead, Congress chose to use the term "gross annual income."

### (d) Congress' election to use "gross annual income" versus "disposable income" shows this Court that "gross annual income" should not deduct business expenses

This Court's refusal to apply the definition of "disposable income" is buttressed by the fact that this term was in existence before the enactment of the RLCDPA in 1998.  When

---

[34] *Maney v. Kagenveama (In re Kagenveama)*, 541 F.3d 868, 872 (9th Cir. 2008) (citing *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004)).
[35] *See* 11 U.S.C. §§ 1222, 1225(b)(2)(B), 1229(d)(1), 1322(b)(f), 1325(b)(1)(B), 1329(a)(4)(B)(ii) (2006).
[36] *Kagenveama*, 541 F.3d at 874 (citing *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 439-40 (2002) and *Camacho v. Bridgeport Fin. Inc.*, 430 F.3d 1078, 1081 (9th Cir. 2005)).

Congress added § 548(a)(2) pursuant to the RLCDPA, it was aware of the term "disposable

income" and chose not to use this term in § 548(a)(2); instead "gross annual income" was used.

In addition, Congress also amended § 1325 to deduct from disposable income "charitable

contributions that do not exceed 15 percent of the debtor's gross income."  Congress could have

easily used the term "disposable income"; however, it chose to use "gross income" in both §

1325(b)(2)(A)(ii) and § 548(a)(2).  As a result, because "disposable income" was defined as

income less reasonably necessary expenses to live and continue to operate a business, "gross

annual income" must mean something different.  If Congress wanted to have business gross

income reflect deductions for operation of a business, it would have used the term "disposable

income" in § 548(a)(2), referring to § 1325(b), which was already in the Code when the

RLCDPA was passed.  It decided not to do so.

Congress had another opportunity to use the term "disposable income" for purposes of §

548(a)(2) when the 2005 Bankruptcy Abuse Prevention and Consumer Protection Act

("BAPCPA") was enacted.  BAPCPA amended several provisions of § 548 (i.e., §§ 548(a)(1),

548(a)(1)(B)(iv), 548(d)(2), and 548(e)).  BAPCPA also modified § 1325(b)(2)'s definition of

"disposable income."[37]  However, subsection (B) of § 1325(b)(2) remains unchanged.  "Under

BAPCPA, the phrase current monthly income was introduced into § 1325(b)(2), but the

reduction of business expenses remained intact. . . . [B]usiness expense deductions under §

1325(b)(2)(B) continue to be a factor in arriving at a debtor's disposable income under

BAPCPA."[38]  If it were the intent of Congress to use the definition of "disposable income," the

term "disposable income" would have been employed in § 548 instead of "gross annual income."

---

[37] *See* 11 U.S.C. § 1325(b)(2) (2006).
[38] *Drummond v. Wiegand (In re Wiegand)*, 386 B.R. 238, 242 (B.A.P. 9th Cir. 2008).

1  However, Congress elected to utilize the term "gross annual income."  Congress could have

2  specified that "gross annual income" would require the deduction of business expenses, similar

3  to how "disposable income" requires the deduction of business expenses.  Section 548(a)(2) does

4  not specify any deductions of any kind.  As a consequence, in determining a debtor's "gross

5  annual income" under § 548(a)(2), business expenses should not be deducted from gross receipts.

6

7  **(e) Policy dictates not deducting business expenses from "gross annual income"**

8  Not only does the plain meaning and comparison to other sections of the Code convince

9  this Court that GAI should be defined as all income without deductions, but also the policy

10  behind the RLCDPA further persuades the Court that GAI should be given a meaning that would

11  insulate greater amounts of charitable contributions from the avoidance powers of a bankruptcy

12  trustee.  The legislative history of the RLCDPA states that the act "protects religious and

13  charitable organizations from having to turn over to bankruptcy trustees donations these

14  organizations received from individuals who subsequently file for bankruptcy relief.  In addition,

15  the bill protects the rights of debtors to continue to make religious and charitable contributions

16  after they file for bankruptcy relief."[39]  This Court's interpretation of "gross annual income"

17  furthers this policy by allowing a higher earner to give more money to charitable organizations

18  without fear of that organization surrendering the money in an avoidance action in the event that

19  the higher earner files for bankruptcy.

20

21  **(f) State law should not be followed in defining "gross annual income" in §
   548(a)(2)**

22  The Trustee would like the Court to follow the definition of "gross income" as used in

23  California homestead exemption cases.  The Trustee cites to the *Shelley v. Kendall (In re*

24

25

26

27

28  [39] H.R. Rep. No. 105-556, at 1 (1998), *reprinted in* F Alan N. Resnick & Henry J. Sommer *Collier on Bankruptcy* App. Pt. 41(o)(ii)(A), at App. Pt. 41-259-60 (15th ed. rev. 2008).

1  *Shelley)*[40] decision where the Ninth Circuit BAP defined gross income to determine the amount

2  of a California homestead exemption.  The BAP analyzed a United States Supreme Court case[41]

3  and determined that a retail store debtor's gross annual income for purpose of a California

4
5  homestead statute was the gross receipts less cost of inventory and operating expenses.[42]

6  Another case cited by the Trustee was *In re Bush*,[43] where a bankruptcy court had to determine

7  the amount of the debtor's homestead exemption and held that the gross income for a sole

8  proprietorship debtor, whether the debtor's business was service-oriented or a retail store, was

9  the gross receipts less "expenditures required for the operation of the business . . . ."[44]

10
11      All of these cases cited by the Trustee involve the interpretation of "gross income" in

12  California Code of Civil Procedure § 704.730 for the purpose of determining a debtor's

13  homestead exemption.  This Court declines to adopt this definition of "gross income" because

14  the rationale behind the homestead exemption differs from that of charitable contributions made

15  prepetition by a debtor that files for bankruptcy.  The homestead exemption policy of saving a

16
17  debtor's home equity does not apply in a charitable contribution case.

18      In addition to differing policy rationales, this Court has no need to look to state law for a

19  definition when, as discussed above, there are cases construing almost the same term in the same

20  federal statute (the Bankruptcy Code).  A federal court should follow federal law when

21
22  _____

23  [40] 184 B.R. 356 (B.A.P. 9th Cir. 1995).
   [41] *Shelley v. Kendall (In re Shelley)*, 184 B.R. 356, 359 (B.A.P. 9th Cir. 1995) ("Income has been defined by the
24  United States Supreme Court as 'undeniable accessions to wealth, clearly realized, and over which the taxpayers
   have complete dominion.'") (citing *Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955)).
25  [42] *Id.* ("Implicit in this concept where income is derived from a business, is the dedication of the revenues of the
   business producing the gross receipts to a payment of the costs and expenses which debtors must pay to sustain and
26  operate the business.  Simply acquiring an inventory is not enough.  Costs such as rent, payroll, and other expenses
   are necessary to transform inventory into income.  Whatever remains of these obligations, if anything, may then be
27  subject to debtor's personal use.").
   [43] 346 B.R. 207 (Bankr. S.D. Cal. 2006).
28  [44] *In re Bush*, 346 B.R. 207, 210 (Bankr. S.D. Cal. 2006).

interpreting a term in a federal statute. Furthermore, if the Court were to use the definition of

"gross income" from the California homestead statute, then GAI would be subject to varying

definitions depending upon where the debtor is located because homestead law varies by state.

### (g) "Gross annual income" for purpose of § 548(a)(2) is all income without deduction of business expenses

This Court holds that where a debtor has a sole proprietorship business, the "gross annual

income" of the debtor, for purpose of charitable contributions in § 548(a)(2), shall be the

business' gross receipts, without subtracting the cost of goods or operating expenses.

According to Debtors' 2005 income tax return, the gross receipts from Dr. Lewis'

business were $325,920. Debtors had no other income for 2005 listed on the tax return. Using

the definition of gross income from the Internal Revenue Code - - as adopted by other federal

courts construing provisions of the Bankruptcy Code - - Debtors' "gross annual income" for

2005 was $325,920. The total amount of charitable contributions made by Debtors to Defendant

in 2005 was $18,380, which is 6% of $325,920. As a result, the contributions made in 2005

"[do] not exceed 15 percent of the gross annual income of the debtor for the year in which the

transfer of the contribution is made."[45] Thus, the 2005 Transfers are not avoidable under §

548(a)(2)(A).

### 2) Consistent practice

Assuming arguendo that Debtors' 2005 GAI is $95,645 - - which would make Debtors'

2005 contributions 19% of the $95,645 figure (thereby exceeding

15%) - - Debtors' contributions in 2005 nevertheless were "consistent with the practices of the

---

[45] 11 U.S.C. § 548(a)(2)(A) (2006).

1    debtor in making charitable contributions."[46]

2        For the transfers made in 2005, the Trustee argued in his trial brief that these transfers

3    were 20% of Debtors' GAI because Debtors' 2005 tax return shows $95,645 in business income,

4
5    and donation receipts show they gave $19,380 to the Church in 2005.[47]  The Trustee's brief also

6    stated that in 2004 Debtors reported income of $56,407 on their tax return, and donation receipts

7    show they gave $6,700 that year to the Church, or approximately 12% of business income.[48]  The

8    Trustee noted that at the time of the trial, 2006 income tax returns had yet to be filed by

9    Debtors.[49]  The Trustee looked to Debtors' Statement of Financial Affairs to state that Debtors

10
11   business income for 2006 up to the filing date was $105,092.71, and donation receipts for that

12   same period show they gave $12,990 to the Church, or approximately 12% of business income.[50]

13   The Trustee argued in his trial brief that since Debtors' donations for 2004 and 2006 totaled 12%

14   of Debtors' GAI for each year and Debtors' donations for 2005 totaled 20% of Debtors' GAI, the

15   donations in 2005 were not consistent with Debtors' practice of contributing 12% in 2004 and

16
17   2006, so the 2005 Transfers should be avoided.

18       In its trial brief Defendant pointed to Dr. Lewis's deposition, where he stated that as a

19   child he was taught to always give a portion of his earnings to the church and that he made it his

20   goal to tithe in the amount of $1,000 per month and to give an additional $500 per month as an

21
22

---

23   [46] 11 U.S.C. § 548(a)(2)(B) (2006).
     [47] The actual amount of donations given to the Church in 2005 was $18,380, which is 19% of $95,645.
24   [48] Debtors' 2004 tax return shows gross receipts in the amount of $242,372, and donation receipts reflect Debtors
25   gave $6,700 to the Church in 2004.  Based on the proposition that GAI should not deduct business expenses, the
     percentage of charitable contributions given to the Church in 2004 was only 3% of Debtors' 2004 GAI.
     [49] Since the record does not include a copy of Debtors' 2006 tax return, the Court is unable to calculate the
26   percentage of charitable contributions given to the Church in 2006 based on Debtors' 2006 GAI.
     [50] Calculating the sum of the amounts given to the Church in 2006 up to the filing date, the amount of donations
27   given to the Church in 2006 up to the filing date was $13,990, which is 13% of $105,092.71.  Since the Court is
     unable to calculate the percentage of charitable contributions given to the Church for the entire year, the Court will
28   use the figures up to the filing date for purposes of this § 548(a)(2) analysis.

offering. It further stated that some months he did not meet this goal, other months he exceeded it, especially at Christmas time. Defendant's trial brief also stated that each year, Dr. Lewis aspired to contribute $18,000, that in 2004 Debtors reported $17,648 in gifts to charity on their 2004 tax return,[51] and in 2005 Debtors reported $17,950 in gifts to charity on their tax return.[52] Defendant argued that the amounts Debtors actually contributed to charity, as evidenced by their deposition testimony, their income tax returns, and receipts of contribution, were consistent with their stated goal.

The Bankruptcy Code does not define "consistent." Webster's Third New International Dictionary of the English Language Unabridged defines "consistent" to mean "marked by harmony, regularity, or steady continuity throughout : showing no significant change, unevenness, or contradiction . . . ."[53]

In *Jackson v. Church of Manapalan, Inc. (In re Jackson)*[54] the bankruptcy court for the District of New Jersey discussed the word "consistent" in the context of § 548, stating that there are factors to consider to determine whether a debtor's practice in giving charitable contributions is consistent, to wit: the amount of the transfer versus past transfers, and the percentage of the debtor's income each year that is devoted to charitable contributions.[55] The court also looked to Webster's New Collegiate Dictionary's definition of "consistent."[56]

---

[51] Looking at the donation receipts from the Church that show $6,700 was donated to the Church in 2004, it appears that the tax return amount of $17,648 for 2004 included other charitable contributions, perhaps to other organizations, evidence of which is not in the record.

[52] Looking at the donation receipts from the Church that show $18,380 was donated in 2005, it appears that the tax return amount of $17,950 for 2005 did not include all of the contributions made by Debtors to the Church.

[53] *Webster's Third New International Dictionary of the English Language Unabridged* 484 (1986).

[54] 249 B.R. 373 (Bankr. D.N.J. 2000).

[55] *See Jackson v. Church of Manalapan, Inc. (In re Jackson)*, 249 B.R. 373, 377 (Bankr. D.N.J. 2000).

[56] *Id.* ("Interpretation of the phrase clearly requires, however, a comparison of the amount of the transfer in question with the amounts of the debtor's past transfers. Where a debtor's income has changed it is also appropriate to compare the transfer as a percentage of the debtor's income with past transfers as such percentages. The degree of variation which is permitted within the meaning of the term 'consistent' will undoubtedly be difficult in certain

1    Debtors' donation practices went from 12% of annual income in 2004 to 19% of annual

2    income in 2005 and then back to 13% of annual income in 2006.  However, the word

3    "consistent" is a fluid term and is not rigid.  Section 548(a)(2) could have used the term

4
5    "conforming" or "identical" or "same," but it uses the word "consistent."  Dr. Lewis consistently

6    had the practice of giving charitable donations.  Looking at the actual amounts, they did not

7    differ greatly from year to year.  The total amount of contributions in 2005 was $18,380, whereas

8    the total amount of contributions in 2006 was $18,790, a difference of only $410.  In addition,

9
10    12% and 13% are not inexorably *in*consistent with 19%.  This Court finds that the 2005

11    Transfers were consistent with Debtors' practice in making charitable contributions.  The 2005

12    Transfers may not be avoided pursuant to § 548(a)(2)(B).

13    **III)    CONCLUSION**

14    Using the Internal Revenue Code's definition of "gross income," the 2005 Transfers were

15    below 15% of Debtors' GAI.  Even assuming that the transfers exceeded 15% of Debtors' GAI,

16    the contributions made in 2005 were consistent with the practices of Debtors in making

17
18    charitable contributions.  Therefore, the 2005 Transfers may not be avoided under § 548(a)(2)(A)

19    or (B).

20

21    Dated:  2/17/09

22                                                ALAN M. AHART
                                                United States Bankruptcy Judge
23

24

25

26

27
      cases.  The term 'consistent' is defined by Webster's New Collegiate Dictionary as 'marked by harmonious
28    regularity or steady continuity: free from irregularity, variation or contradiction.'").